840 F.2d 1496
 Robyn Leroy PARKS, Plaintiff-Appellant,
v.
John N. BROWN, Warden, Oklahoma State Penitentiary,
McAlester, Oklahoma; Larry Meachum, Superintendent,
Oklahoma Department of Corrections; and Michael C. Turpen,
Attorney General of Oklahoma, Defendants-Appellees.
 No. 86-1400.
 United States Court of Appeals,
Tenth Circuit.
 July 15, 1987.
As Modified on Denial of Rehearing March 1, 1988.
Suggestion for Rehearing En Banc Granted March 1, 1988.
 
 Vivian Berger, New York City (Lewis Barber, Jr., Oklahoma City, Okl., with her on the brief), for plaintiff-appellant.
 Robert A. Nance, Asst. Atty. Gen., Deputy Chief, Federal Div. (Michael C. Turpen, Atty. Gen., Okl., and Michael W. Elliott, Asst. Atty. Gen., with him on the brief in chief, and Robert H. Henry, Atty. Gen., Okl., with him on appellees' supplemental response brief), Oklahoma City, Okl., for defendants-appellees.
 Before McKAY, BALDOCK and McWILLIAMS, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 In a proceeding in the District Court of Oklahoma County, State of Oklahoma, a jury convicted Robyn Leroy Parks of the first-degree murder of Abdullah Ibrahim, a Gulf gas station attendant, and the same jury, after further hearing, sentenced Parks to death. Parks' conviction and sentence were affirmed on direct appeal by the Oklahoma Court of Criminal Appeals. Parks v. State, 651 P.2d 686 (Okla.Crim.App.1982), and the Supreme Court of the United States denied certiorari, Justice Brennan and Justice Marshall dissenting. Parks v. Oklahoma, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).
 
 
 1
 Parks then sought post-conviction relief in the state courts of Oklahoma. The state district court denied relief and the Oklahoma Court of Criminal Appeals affirmed in an unreported order and opinion. Thereafter, the United States Supreme Court denied certiorari. Parks v. Oklahoma, 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 356 (1984).
 
 
 2
 On June 29, 1984, eleven days before he was scheduled for execution, Parks filed in the United States District Court for the Western District of Oklahoma a petition for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. The district court stayed execution, and, on November 5, 1985, in a 33-page opinion, dismissed all of the claims asserted by Parks in his petition except the claim of ineffective assistance of counsel at the penalty phase of the state criminal proceeding. Before ordering an evidentiary hearing concerning the claim of ineffective assistance, the district court determined to first propound interrogatories to the petitioner, Parks. Based on the answers thereto, the district court, by order of February 28, 1986, denied relief on the claim of ineffectiveness of counsel and dismissed all claims. This appeal followed. We are advised that the parties have agreed that no new execution date will be set pending disposition of the present appeal.
 
 
 3
 The government's case-in-chief established the following. Abdullah Ibrahim, a native of Bangladesh, was attending school in Oklahoma and working part-time at a Gulf gas station in Oklahoma City, Oklahoma. On the morning of August 17, 1977, a motorist who had stopped at the Gulf station at around 4:30 a.m. to buy some cigarettes found the attendant, Ibrahim, dead inside the station booth. Ibrahim's death was caused by a gunshot wound in the chest. No money or other property had been taken from the booth. However, the investigating officers found an unused Gulf gas credit card charge slip in the booth with the letters and figures "XZ-5710" written on it and circled. The police checked out this alpha-numeric combination, and ascertained that it corresponded with the license number of an automobile in which Parks had an interest, possessory, at the least, if not strict legal title thereto.
 
 
 4
 Parks at this point in the investigation became either a prime suspect or a material witness, and it was ascertained that Parks was then in California. In the meantime the police had contacted a friend of Parks', one James Clegg, and enlisted the latter's aid. Clegg, in Oklahoma, called Parks, in California, on several occasions, and, with Clegg's consent, two phone conversations were tape recorded. In the first of these two recorded conversations, Parks told Clegg that he went to the Gulf station intending to get gas with a stolen credit card and that the attendant came out of the booth and appeared to write down his license number. Fearing that the attendant would "call the law" and also fearful that if the police caught him they would find guns and dynamite which he had placed in the trunk of his car, Parks decided to kill the attendant so that if "he don't be around there ain't nothing he can tell them noway." In this setting, according to Parks, he went to the station booth and shot and killed the attendant. Apparently, the door to the station booth was partially open and Parks fired one shot which struck Ibrahim in the chest.
 
 
 5
 In Parks' second taped telephone conversation with Clegg, Parks, still in California, described where he had disposed of the murder weapon. Thereafter the police, accompanied by Clegg, went to the described location, which was miles away from the gas station, and recovered a .45 caliber revolver, together with a holster and ammunition, hidden under a bush. One shot had been fired from the revolver, the other five cylinders containing live ammunition. Parks was later arrested in California and extradited to Oklahoma. Both of the taped telephone conversations were played for the jury.
 
 
 6
 At trial, Parks testified in his own behalf and denied killing Ibrahim. He testified that at the time of the killing he was in another place, and a witness corroborated his alibi. Parks explained the fact that the license number of his car was found on the unused credit card slip by stating that several days before the homicide he had been in this particular gas station and had purchased gas when he had no money. He said the attendant at that time took down his license number, but that he had returned later on the same date and paid for the gas. Parks also explained his presence in California at the time of his arrest by testifying that subsequent to the date of the killing he had gone first to Kansas City, and then to California, in an effort to buy marijuana. On this general state of the record a jury convicted Parks of first-degree murder and the same jury, after further hearing, sentenced him to death.[1]
 
 
 7
 On appeal to this Court, Parks asserts that his state conviction and sentence is constitutionally infirm for any one, or all, of the following reasons: (1) failure of the state trial court to instruct the jury on a lesser included offense; (2) admission of a prior conviction of Parks for robbery by force and fear; (3) improper comment to the jury by the state prosecutor in the hearing at the penalty phase of the case; (4) error by the trial court in instructing the jury to disregard "sympathy"; (5) incomplete and misleading instruction on aggravating circumstances vis-a-vis mitigating circumstances; (6) ineffective assistance of counsel at the penalty phase hearing; and (7) failure of the trial court to hold an evidentiary hearing on his claim that Oklahoma's death sentence statutes are applied in a racially discriminatory manner. These matters will be considered seriatim.
 
 I. Lesser Included Offense
 
 8
 The state trial court refused to instruct the jury on murder in the second degree and such fact is alleged to render Parks' conviction for first-degree murder unconstitutional. The state trial court initially refused to instruct on second-degree murder on the ground that "there was no evidence as to how much had been charged on the stolen card." The trial court later grounded its refusal to thus instruct on the fact that there was "no evidence" that a credit card offense had been committed.[2] The Oklahoma Court of Criminal Appeals, on direct appeal, agreed that there was no evidence to support "a lower degree of the crime charged or an included offense...." Parks v. State, 651 P.2d, at 690.[3]
 
 
 9
 The federal district judge in the present habeas corpus proceeding was unimpressed with the reasoning of either the state trial court or the Oklahoma Court of Criminal Appeals on the lesser included offense argument, but nonetheless reached the same result based on Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) and Palmer v. State, 327 P.2d 722 (Okla.Crim.App.1958).[4] In so holding, the federal district judge concluded that the state had made a prima facie case of the greater offense, i.e., murder in the first degree, and that the evidentiary matter relied on by the defendant, Parks, for requesting an instruction on second-degree murder was "no evidence whatever to refute the allegations of the information." The court commented that, under Palmer v. State, supra, the evidence relied on by Parks, in order to justify the instruction on second-degree murder, must "raise the issue of whether the defendant was guilty of the lesser offense only." We need not attempt to reconcile these different approaches to the problem, since our view of the testimony relied on by the defendant is such that there was no error in the trial court's refusal to instruct on second-degree murder.
 
 
 10
 In advancing this particular argument, counsel relies heavily on Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In Beck, the Supreme Court, citing Keeble v. United States, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973), commented, at p. 635, as follows:
 
 
 11
 In the federal courts, it has long been "beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser included offense and acquit him of the greater." (Emphasis added).
 
 
 12
 Our analysis of the evidence relied on by counsel in advancing the lesser included offense argument is that the evidence would not permit a jury to rationally find Parks guilty of second-degree murder and acquit him of first-degree murder.
 
 
 13
 Under Oklahoma law, a person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Further, "malice" is defined as the "deliberate intention" to take the life of another, which intent is manifested by "external circumstances capable of proof." Okla.Stat. tit. 21, Sec. 701.7(A) (1981).
 
 
 14
 Okla.Stat. tit. 21, Sec. 701.7(B) (1981) further provides that a person also commits the crime of murder in the first degree when he kills another, "regardless of malice," in the commission of certain enumerated crimes, such as forcible rape, robbing with a dangerous weapon, kidnapping, and the like. A killing occurring in connection with the use of a stolen credit card is not one of the enumerated crimes constituting murder in the first degree.
 
 
 15
 Okla.Stat. tit. 21, Sec. 701.8 (1981) provides that a homicide is murder in the second degree when perpetrated by an act imminently dangerous to another, "although without any premeditated design to effect the death of any particular individual." That same statute also states that a homicide is murder in the second degree when perpetrated by a person engaged in a felony "other than" the felonies enunciated in Okla.Stat. tit. 21, Sec. 701.7(B) (1981). Okla.Stat. tit. 21, Sec. 1550.22 (1981) provides, in effect, that it is a felony to unlawfully use or possess a stolen credit card.
 
 
 16
 Based on the foregoing statutes, Parks argues that under Oklahoma law the state district court should have instructed the jury on second-degree murder and that the failure to so instruct violates the mandate of Beck v. Alabama, supra. In thus arguing, counsel suggests that there is evidence that the homicide in the instant case occurred when Parks was engaged in a felony (using a stolen credit card) other than the ones enumerated in Okla.Stat. tit. 21, Sec. 701.7(B) (1981) and that accordingly an instruction on second-degree murder was mandated by Beck. The argument borders on the ingenious, but in our view does not stand up under a careful analysis of the evidence relied on for the giving of such instruction.
 
 
 17
 As indicated, Parks testified in his own behalf and denied killing Ibrahim, testifying that he was elsewhere at the time of the homicide. So, there is nothing in the defendant's testimony that would justify giving an instruction on second-degree murder. The evidence which counsel relies on in advancing the present argument are the statements made by the defendant to Clegg in the two tape-recorded telephone conversations, particularly the first of the two conversations. We do not agree that these statements made by Parks to Clegg required an instruction to the jury on second-degree murder.
 
 
 18
 Parks, in his statements to Clegg, indicated that he had gone to the Gulf station to buy gas with a "hot" credit card. Presumably, Parks had pumped the gas and had used the "hot" credit card for payment. In any event, thereafter Parks noticed the attendant taking down his license number. Then, Parks, according to his statements to Clegg, formed a deliberate intent to kill the attendant in the belief that "dead men tell no tales." Parks at the time was apparently concerned not only with the "hot" credit card, but also with the small arsenal, consisting of guns and dynamite, which he had in the trunk of his car. It was in this setting that Parks proceeded to the attendant's booth and, through the partially opened door to the booth, shot Ibrahim once in the chest. This evidence does not justify an instruction on a homicide without malice occurring in the use of a stolen credit card. It only shows a premeditated killing of another with deliberation and malice, the motive, therefore, being a desire to avoid possible detection by the police.
 
 
 19
 We believe our holding that the evidence in the instant case did not require an instruction to the jury on second-degree murder squares not only with Beck, but that it is also in accord with subsequent decisions of the Supreme Court in such cases as Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) and Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Hopper involved a homicide perpetrated during the course of an armed robbery. The defendant, against the advice of his attorney, testified and stated, in effect, that he deliberately shot the deceased in the back. Later, in a federal habeas corpus proceeding brought by the defendant's mother, the Supreme Court held that an instruction on second-degree murder was not required since "the defendant's own evidence negates the possibility that such an instruction might have been warranted." 456 U.S., at 606, 102 S.Ct. at 2050. In the instant case, Parks' own statements to Clegg concerning the homicide negate his counsel's claim of second-degree murder.
 
 
 20
 In Spaziano v. Florida, supra, there apparently was evidence, which if believed by the jury, would have supported a verdict of second-degree murder. However, the Florida statute of limitations had run on murder in the second degree, a non-capital offense, but had not run on murder in the first degree, a capital offense. In such circumstance, the state trial judge refused to instruct the jury on second-degree murder unless the defendant agreed to waive the statute of limitations. This the defendant refused to do, and no instruction was given. The defendant was ultimately convicted of first-degree murder and sentenced to death. The Supreme Court in Spaziano found no error in the state trial court's refusal to instruct on second-degree murder, stating that "[w]here no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process. Beck does not require that result." 468 U.S., at 455, 104 S.Ct. at 3159.
 
 
 21
 II. Admission of Evidence That Parks Had a Prior Felony Conviction
 
 
 22
 In 1972, Parks, then seventeen years of age, was charged as an adult with robbery by force and fear. He pled guilty to the charge and was given a five-year suspended sentence. A few years later Parks was also convicted of attempted burglary in the second degree after a felony charge and was imprisoned for three years for that conviction. At the very commencement of the state trial on the murder charge, Parks sought an order which would preclude the use of his prior conviction for robbery at the guilt phase of the proceeding. No challenge was made to the prosecution's possible use of the burglary conviction for impeachment purposes should Parks elect to testify in his own behalf. The reason advanced for the exclusion of the robbery conviction was that Parks was only seventeen years of age at the time of the robbery conviction and that accordingly such conviction was invalid under Lamb v. Brown, 456 F.2d 18 (10th Cir.1972). See Radcliff v. Anderson, 509 F.2d 1093 (10th Cir.1974) (en banc), cert. denied, 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 (1975); Bromley v. Crisp, 561 F.2d 1351 (10th Cir.1977) (en banc), cert. denied, 435 U.S. 908, 98 S.Ct. 1458 (1978). See also Edwards v. State, 591 P.2d 313 (Okla.Crim.App.1979).
 
 
 23
 The state trial court denied Parks' request, noting that no challenge had ever been made in state court to the conviction. At trial, then, defense counsel, in his direct examination of Parks in the "guilt-phase" of the state proceeding, brought out the fact of the robbery conviction and the burglary conviction. This was the state of the record on this particular matter when the case went to the jury on the guilt-or-innocence phase of the trial. Later, in the penalty phase of the bifurcated proceeding, the jury was ultimately apprised of all of the underlying facts leading up to Parks' plea of guilty to robbery with force or fear. In brief, the facts were that Parks, and two other black youths, accosted a white student in a school yard and after a fight took six cents from the victim. All involved were students.
 
 
 24
 The federal district judge in the habeas corpus proceeding ruled that any possible error in connection with the admission into evidence of Parks' prior robbery conviction was, when viewed in context, "harmless error" as that term is defined in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We agree and are not inclined to disturb that ruling.
 
 
 25
 At the time when the jury was deliberating the guilt-or-innocence of Parks on the murder charge, the jurors knew about the robbery conviction, but did not, at that time, know of the underlying facts leading up to Parks' plea of guilty to the robbery charge.[5] However, counsel in the penalty phase of the proceeding went "behind" the robbery conviction and apprised the jury of all the underlying facts and circumstances. Thus, the jury was eventually fully informed about the entire matter and knew that this was not, by way of example, the armed robbery of a bank by an adult offender, but, on the contrary, arose out of a fracas in a school yard where only six cents was taken from the pocket of the victim.
 
 
 26
 In our view, this entire episode was de minimis, and must have been viewed as such by the jury. As the federal district court observed, the evidence of Parks' guilt was overwhelming. It is seldom that authorities have a tape-recorded confession to a crime made during the investigative process. In the first tape-recorded telephone conversation, Parks admitted the crime and related details which only the perpetrator could know. In the second recorded conversation, Parks detailed where the death weapon could be found, and the police, following Parks' directions, found the weapon. The introduction of the robbery conviction at the guilt phase of the proceedings is plainly harmless error, if it be error, beyond any reasonable doubt.
 
 
 27
 In the penalty phase of the proceeding, where the jury was weighing life vis-a-vis death, the jury was fully informed as to the circumstances giving rise to the robbery charge. At that stage, the jury in effect rejected the State's arguments for the sole statutory aggravating circumstance to which this robbery conviction was relevant, when it refused to find that there was a probability that Parks would commit criminal acts of violence in the future that would constitute a continuing threat to society. See note 1, supra. The only aggravating circumstance contended for by the State which the jury found supported by the evidence was that the murder was committed by Parks for the purpose of avoiding or preventing a lawful arrest or prosecution, which was the reason given by Parks himself for the killing. We refuse to believe that a jury would impose the death sentence because of Parks' conviction for a crime arising out of a school yard fist fight. To us, it is inconceivable that a jury of twelve adults would be influenced in any manner by such testimony to the end that such would affect their deliberation on either the question of guilt or penalty in a first-degree murder proceeding. We have more faith in the jury system.
 
 
 28
 III. Improper Comment by State Prosecutor in Closing Argument
 
 
 29
 Counsel argues that statements made by the prosecutor to the jury during closing argument in the penalty phase of the case come within the prohibitions laid down in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Supreme Court in Caldwell held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id., at 328-29, 105 S.Ct. at 2639 (emphasis added). In Caldwell, the prosecutor, according to the majority opinion, sought to "minimize the jury's sense of the importance of its role." Specifically, the state prosecutor commented that should the jury return a death sentence, such would be "automatically reviewable by the Supreme Court."
 
 
 30
 In the instant case, the state prosecutor spoke to the jury as follows:
 
 
 31
 But, you know, as you as jurors, you really, in assessing the death penalty, you're not yourself putting Robyn Parks to death. You just have become a part of the criminal justice system that says when anyone does this, that he must suffer death. So all you're doing is you're just following the law, and what the law says, and on your verdict--once your verdict comes back in, the law takes over. The law does all of these things, so it's not on your conscience. You're just part of the criminal justice system that says when this type of type [sic] of thing happens, that whoever does such a horrible, atrocious thing must suffer death. Now that's man's law. But God's law is the very same. God's law says that the murderer shall suffer death. So don't let it bother your conscience, you know.
 
 
 32
 We do not read the prosecutor's comment to minimize the importance of the jury's role in fixing Parks' sentence. In Darden v. Wainwright, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court, in footnote 15 at page 2473, stated, in part, as follows:
 
 
 33
 Caldwell is relevant only to certain types of comment--those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. In this case, none of the comments could have had the effect of misleading the jury into thinking that it had a reduced role in the sentencing process. If anything, the prosecutors' comments would have had the tendency to increase the jury's perception of its role. We therefore find petitioner's Eighth Amendment argument unconvincing.
 
 
 34
 In Dutton v. Brown, 812 F.2d 593 (10th Cir.1987) (en banc), and in Coleman v. Brown, 802 F.2d 1227, 1240-41 (10th Cir.1986) this Court considered closing arguments quite similar, though not completely identical, to that made in the instant case and held that such comment was not constitutionally impermissible. In the instant case, we have read the entire closing argument of both the prosecutor and defense counsel in the penalty-phase of the case. There was no objection by defense counsel to the prosecution's argument. We fail to see how the argument of the prosecution, read in its entirety, tends to minimize or downgrade the importance of the jury's determination of the penalty to be imposed. Indeed, the prosecutor's remarks tended to dramatize the extreme importance of the matter and was an exhortation to the jury to "follow the law" of both man and God.
 
 IV. Anti-Sympathy Instruction
 
 35
 Instruction No. 9 at the penalty phase of the state proceeding advised the jury, in part, as follows:
 
 
 36
 You are the judges of the facts. The importance and worth of the evidence is for you to determine. You must avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence. You should discharge your duties as jurors impartially, conscientiously and faithfully under your oaths and return such verdict as the evidence warrants when measured by these Instructions (emphasis added).
 
 
 37
 Trial counsel did not object to the foregoing instruction. However, counsel in the federal habeas corpus proceeding in the district court, and here, argues that the giving of the "anti-sympathy" instruction constitutes constitutional error. In thus arguing, counsel relies primarily on Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and, in a Supplemental Brief, counsel both relies on and distinguishes the recent case of California v. Brown, --- U.S. ----, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).
 
 
 38
 Neither Skipper, Eddings, nor Lockett concern an instruction to the jury that in their deliberations they should "avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor...." These cases all stand for the general proposition that under the Eighth and Fourteenth Amendments the sentencer in a capital case should not be precluded from considering as a mitigating factor any aspect of the defendant's character and background which might serve as the basis for a sentence less than death. In Skipper, the Supreme Court held that the exclusion of testimony of jailers and of a regular visitor regarding the defendant's good behavior during the defendant's seven months' incarceration in jail awaiting trial deprived him of his right to place before the sentencers "relevant evidence on mitigation." In Eddings, the Supreme Court vacated a state conviction wherein the death penalty was imposed after the state court refused to consider as a mitigating circumstance the defendant's unhappy upbringing and emotional disturbance, including evidence of the defendant's turbulent family history and beatings by a harsh father. In Lockett, the Supreme Court held that "in all but the rarest kind of capital case, [the sentencer may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record that the defendant proffers as a basis for a sentence less than death." 438 U.S., at 604, 98 S.Ct. at 2964 (opinion of Burger, C.J.) (footnotes omitted) (emphasis in original).
 
 
 39
 In its simplest form, then, Parks' argument is that "sympathy" could serve as the basis of a sentence less than death, and therefore the jury must be allowed to consider it. The Supreme Court recently confronted an "anti-sympathy" instruction in California v. Brown, supra. In that case, the jury was instructed not to be "swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase. 107 S.Ct., at 840. The California Supreme Court had held that the anti-sympathy instruction violated the Eighth Amendment and stated that a defendant had a right to "sympathetic consideration of all the character and background evidence" which is presented as mitigating evidence. People v. Brown, 40 Cal.3d 512, 709 P.2d 440 (Cal.1985). The Supreme Court granted certiorari and reversed, holding that the anti-sympathy instruction in Brown did not violate the Eighth or Fourteenth Amendments. It is true that the Supreme Court in Brown noted that the instruction there referred to "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," whereas the instruction in the instant case did not utilize the adjective "mere." However, such, under Brown, does not dictate a reversal in the instant case, and, in any event, we are not persuaded by the rationale of the California Supreme Court in Brown.
 
 
 40
 In our view, "sympathy" and "mitigating factors" are not synonyms. Mitigating factors are based on evidence arising generally out of testimony concerning a defendant's background and from the facts and circumstances surrounding the crime for which the defendant is on trial. Sympathy, on the other hand, as is evident from the context of the challenged instruction, here plainly refers to the mere emotional responses of jurors. The instruction directs the jury to make its sentencing decision based on the aggravating and mitigating evidence presented, and not on "extraneous emotional factors." Brown, 107 S.Ct., at 840. A jury should indeed not be influenced by "sympathy" for either the defendant, or, for that matter, for the victim and his family.
 
 
 41
 In his Supplemental Brief in this Court, petitioner attempts to show that, under the approach of Justice O'Connor's concurring opinion and four dissenters in Brown, the challenged instruction, taken together with certain remarks made by the prosecutor, renders his sentence infirm. In Brown, Justice O'Connor agreed that an anti-sympathy instruction, by itself, does not violate the Constitution. However, she cautioned that care must be taken, else "juries may be misled into believing that mitigating evidence about a defendant's background or character also must be ignored." 107 S.Ct., at 842 (concurring opinion). Here, however, there is no possibility that the jury was misled concerning its role or the scope of the mitigating circumstances it could consider. The jury was clearly informed that the only bound on the mitigating circumstances it could consider was the evidence found "to exist in this case."[6] In addition to the statutory mitigating circumstances, which the jury was told it must consider, the court instructed the jury that it "may consider any other or additional mitigating circumstances, if any, that you may find from the evidence to exist in this case."
 
 
 42
 Thus the jury was not instructed to ignore mitigating evidence. Such an instruction would indeed run afoul of the principles of Lockett and Eddings. Instead, the jury was instructed to confine its consideration of both aggravating and mitigating factors to the evidence before it, to "avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence," and to discharge its duties "impartially, conscientiously and faithfully under your oaths and return such verdict as the evidence warrants when measured by these Instructions." Since we believe that a rational juror, hearing this instruction, would conclude "that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating," Brown, 107 S.Ct., at 840, the petitioner's claim based on the "anti-sympathy" instruction must be denied.
 
 
 43
 V. Incomplete and Misleading Instructions On Aggravating
 
 
 44
 Circumstances Vis-a- vis Mitigating Circumstances
 
 
 45
 Instruction No. 7 given the jury, without objection, in the penalty-phase proceeding reads as follows:
 
 
 46
 In the event you find unanimously that one or more of these aggravating circumstances existed beyond a reasonable doubt, then you would be authorized to consider imposing a sentence of death.
 
 
 47
 If you do not find unanimously beyond a reasonable doubt one or more of the statutory aggravating circumstances existed, then you would not be authorized to consider the penalty of death, and the sentence would be imprisonment for life.
 
 
 48
 Even if you find unanimously one or more of the aggravating circumstances existed beyond a reasonable doubt, and if you further find that such aggravating circumstance or circumstances is outweighed by the finding of one or more mitigating circumstance, then and in such event the death penalty shall not be imposed, and the sentence would be imprisonment for life.
 
 
 49
 On appeal, Parks asserts that the foregoing instruction is constitutionally defective in three particulars: (1) the instruction failed to instruct the jury that even if it found that the aggravating circumstances outweighed the mitigating circumstances it could still impose a life sentence and, that the charge instructed the jury, inferentially at least, that if it found that the aggravating circumstances outweighed the mitigating circumstances it must impose the death penalty; (2) it improperly places a burden on the defendant of proving that mitigating circumstances outweigh the aggravating circumstances; and (3) it fails to adequately define the nature and function of mitigating circumstances. We do not agree.
 
 
 50
 Under the instruction set forth above, and in accord with Oklahoma statutory and case law, the jury was instructed that it must impose a life sentence unless it unanimously found beyond a reasonable doubt that one or more of the aggravating circumstances alleged by the state existed. Parks' counsel does not object to this statement. The instruction goes on to advise the jury that even if it should find beyond a reasonable doubt the existence of one or more of the aggravating circumstances relied on by the state, it must still impose only a life sentence if it should further find that the aggravating circumstances are outweighed by the mitigating circumstances. Again, counsel has no objection to that part of the instruction. As indicated, what counsel does object to is that the instruction did not go further and instruct the jury, in just so many words, that even if it found that aggravating circumstances outweighed any mitigating circumstances, it could, in its discretion, still fix the penalty at life imprisonment. Such an instruction is not required under Oklahoma law. Nor is such, in our view, required by the Eighth and Fourteenth Amendments.
 
 
 51
 The first paragraph in the challenged instruction states that the jury is "authorized to consider imposing a sentence of death" if it finds unanimously that one or more of the statutory aggravating circumstances existed beyond a reasonable doubt. The second paragraph in the instruction is the reverse of the first paragraph, and instructs the jury that they are not authorized to consider the penalty of death if they do not find unanimously that one or more of the statutory aggravating circumstances existed beyond a reasonable doubt. The third paragraph in the instruction instructs the jury that the death penalty cannot be imposed even if they find unanimously one or more of the statutory aggravating circumstances existed beyond a reasonable doubt, if the jury further finds that such aggravating circumstance, or circumstances, is, or are, outweighed by a further finding of one or more mitigating circumstances. The first paragraph speaks in terms of "authorized to consider" the death penalty, and is not directory in its terms. We think the instruction adequately advised the jury on this particular matter.
 
 
 52
 In Burrows v. State, 640 P.2d 533, 544 (Okl.Cr.1982), the Oklahoma Court of Criminal Appeals was faced with the same argument made here. In rejecting that argument, the Court spoke as follows:
 
 
 53
 The defendant's twenty-first assignment of error is, in part, identical to the argument presented in our recent decision of Irvin v. State, 617 P.2d 588 (Okl.Cr.1980). Arguing from Laws 1976, 1st Extraordinary Session, Chapter 1, Section 5, now 21 O.S.Supp.1980, Sec. 701.11, defendant claims that the jurors must be told four things prior to beginning deliberations. First, the death penalty cannot be imposed unless the jury finds one or more aggravating circumstances beyond a reasonable doubt; second, if the jury finds one or more aggravating circumstances, then they may consider imposing the death penalty; third, if the jury finds one or more aggravating circumstances, but the circumstances are outweighed by mitigating circumstances of the case, the jury cannot impose the death penalty; fourth, even if the jury finds aggravating circumstances, and those circumstances are not outweighed by mitigating circumstances, they can decline to impose the death penalty. In the defendant's case, the jury was given the first three instructions but not the fourth. As in Irvin, the argument is rejected. The fourth instruction was subsumed in the second, since the jurors were told that they could, not that they had to, impose the death sentence. As stated in Irvin:
 
 
 54
 The only discretion provided the jury under the statute [21 O.S.Supp.1980, Sec. 701.11] is that necessary to make a factual finding of the existence or non-existence of aggravating and mitigating circumstances, as well as the discretion requisite in balancing the two.
 
 
 55
 We do not read the instruction set forth above as casting any burden of proof on the defendant. Under that instruction, the jury first had the responsibility of determining whether the state had proved beyond a reasonable doubt any of the aggravating circumstances set forth in its Bill of Particulars. If the jury so found, then, and only then, was it to "weigh" the aggravating circumstance thus found against the mitigating circumstances in the case. This, to us, is not a burden of proof matter.[7]
 
 
 56
 Further, in our view, the jury was adequately instructed on the nature and function of mitigating circumstances. Instruction No. 6 identified eight "mitigating circumstances," and advised the jury that it was not limited to such itemization and could consider "other or additional mitigating circumstances, if any, you may find from the evidence to exist in this case."[8]VI. Ineffective Assistance of Counsel In the Penalty
 
 Phase proceeding
 
 57
 In the federal habeas corpus proceeding, counsel concedes that defense counsel in the state trial court competently and vigorously represented Parks in the guilt phase of Parks' first-degree murder trial. However, it is argued here that Parks' counsel thereafter, in effect, "threw in the towel" and that his representation of Parks in the penalty-phase proceeding was constitutionally deficient and that such prejudiced Parks and conceivably tipped the scales for the death penalty, instead of life imprisonment. The record does not support this argument.
 
 
 58
 Parks was represented in the state trial court by David Hood, who was retained by Parks' father. We agree that Hood's representation of Parks in the guilt phase of the case was not only constitutionally acceptable, but was, from our reading of the record made in the state trial proceeding, considerably above the norm. The jury returned its verdict of guilty at about five o'clock on a Friday afternoon. Hood and the prosecutor were both of a view to commence the penalty phase of the case immediately. The judge, however, thought the jury was perhaps "tired" and set the penalty phase hearing for eight o'clock a.m. on the next day. In the penalty phase hearing, all of the evidence adduced at the trial, which included all of the testimony of the defendant, Parks, was reintroduced. Hood then called as his only witness Parks' father. Parks' father testified at some length concerning his son, his home environment, his education and personal traits. The State had earlier indicated that it might not call any witnesses at the penalty-phase hearing, but after the father testified about his son's robbery conviction, the State did call as a rebuttal witness the victim of the fracas in the schoolyard. The victim's father also testified, and it would appear from his testimony that it was the father's insistence which resulted in the filing of charges against Parks.
 
 
 59
 After closing argument, which was vigorous, the jury received the case around noon. After lunch, the jury commenced their deliberations around 1:30 p.m. and returned the death penalty around 4:45 p.m. At the request of Hood, who was of course present with Parks when the verdict was received, the jury was polled and all jurors indicated that they had voted for the death penalty.
 
 
 60
 In the hearing in federal district court, the judge initially denied all of Parks' claims for relief except the one claim of ineffective assistance of counsel. Rather than hold a full-scale evidentiary hearing into the ineffectiveness of counsel argument, the district court decided to first submit written interrogatories to Parks, which interrogatories Parks, in time, answered and thereafter filed supplemental answers thereto. Parks at this point in time was represented by local Oklahoma counsel who presumably assisted Parks in his answers to the interrogatories. Further, no objection was made at that time to using interrogatories as opposed to a full scale evidentiary hearing.
 
 
 61
 In any event, the answers indicated quite clearly that the sole basis for the claim of ineffectiveness of counsel was that Hood didn't call more witnesses to testify concerning Parks' personal history. In this court, Park's counsel states that there were "at least 25 of Parks' friends, relatives and associates who would have testified in his behalf," and who "would have painted a more complete picture of him as a human being, i.e., church attendance, good performance in school subjects, his non-violent nature as a youth," and the like. It should be noted that by the time a claim of ineffective trial counsel was first made, David Hood, who was Parks' trial counsel, was deceased, having died a short time after the trial. Be that as it may, based on Parks' answers to the interrogatories, and upon a review of the record before him, which included a transcript of the state trial proceedings, the federal district judge rejected the claim of ineffective counsel. Under the circumstances, we are disinclined to disturb his ruling on the matter.
 
 
 62
 In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that in order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness," id., at 688, 104 S.Ct. at 2064, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., at 694, 104 S.Ct. at 2068. Thus, in order to grant relief, a reviewing court must find that both parts of the Strickland test are met. The reviewing court must "indulge a strong presumption" that counsel's assistance was effective, and it is the defendant's burden to overcome the presumption that "the challenged action 'might be considered sound trial strategy.' " Id., at 689, 104 S.Ct. at 2065, quoting Michael v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955). In applying Strickland, we bear in mind that the "essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986).
 
 
 63
 Applying these principles to the instant case, we agree with the federal district court that Parks cannot prevail on his claim of ineffective counsel. The fact that counsel did not call a succession of witnesses who would presumably testify concerning Parks' boyhood years and testify generally as to his character does not show deficient performance by defense counsel. See Dutton v. Brown, 812 F.2d 593 (10th Cir.1987). Under the circumstances, deciding not to call character witnesses was perhaps a wise tactical move. Such witnesses would have been subject to cross-examination and rebuttal. Though Parks may have had an innocent boyhood, his more recent past was not so spotless. In addition to his plea of guilty to the robbery charge, Parks had also been convicted of burglary for which he had served time. Further, as mentioned above, Parks at the time of the homicide was apparently in the drug business. At least that was Parks' own testimony at trial where he explained his presence in California at the time of his arrest by stating that he was in California on a "buying trip." This aspect of the case, of course, was not fully explored in the guilt-phase proceeding, but no doubt defense counsel felt that if he tried at the penalty phase proceeding to inject Parks' general character into the case, the state would endeavor to bring out all the details of Parks' current endeavors, including his trafficking in drugs, as well as the guns and dynamite, which were apparently in the trunk of Parks' vehicle, and the purpose for which they were intended.
 
 
 64
 Counsel argues here that at the very least Parks should have been given an evidentiary hearing on the claim of ineffective counsel and points out that there was an evidentiary hearing in Strickland. We do not believe, however, that an evidentiary hearing must be given in every case involving a claim of ineffectiveness of counsel. In the present case, defense counsel was not available to testify, having died shortly after the state trial. The federal district judge did not reject, out of hand, Parks' claim that defense counsel's courtroom performance was constitutionally deficient. He allowed Parks, assisted by his counsel, to answer interrogatories. And these answers, and supplemental answers, indicated quite clearly that the only fault he had with his counsel was his failure to place his entire history before the jury. If counsel had placed before the jury the entire record made by Parks from the date of his birth to the date of trial, such would undoubtedly include Parks' present drug activities, which would probably not have enhanced Parks' position in the eyes of the jury. If such had been the scenario, the claim in the present proceeding would be that counsel was deficient in permitting his life history to go to the jury. In our view, defense counsel did a competent and vigorous representation of Parks throughout the entire trial. His arguments to the jury were impassioned. In the words of Strickland, Parks' present claim of deficient representation is grounded on "the distorting effects of hindsight." 466 U.S., at 689, 104 S.Ct. at 2065.
 
 
 65
 VII. Refusal of the Federal District Court To Hold an
 
 
 66
 Evidentiary Hearing on Parks' Claim That Oklahoma's Death
 
 
 67
 Penalty Statutes Are Applied Arbitrarily and
 
 
 68
 Discriminatorily Against a Defendant Such as Himself Charged
 
 
 69
 with Killing a White Victim
 
 
 70
 In his petition for habeas corpus, Parks urged as his ninth ground for relief that the application of the death sentence to his case violated his Eighth and Fourteenth Amendment rights. In his petition, Parks initially stated that his case is perhaps the only case where a death sentence was imposed solely on the aggravating circumstance that at the time of the homicide he was attempting to avoid arrest or detection, and that in 90% of the cases where a death sentence was imposed in Oklahoma the jury either found that the offense was heinous, atrocious and cruel, or that there was a probability that the defendant would constitute a continuing threat to society because of his record of violent misconduct, neither of which was the finding of the jury in his case. This particular reason apparently fell by the wayside and was not pursued in the district court, nor is it raised in this Court.
 
 
 71
 In his petition, and as a part of this ninth ground for relief, Parks also urged that based on a study by Samuel R. Gross, an Acting Associate Professor of Law at Stanford University, and Robert Mauro, an Assistant Professor of Psychology at the University of Oregon, one is more likely to receive the death penalty in Oklahoma if he has killed a white person than if he has killed a black person. In this connection, it is further alleged that Parks "will further bring out evidence of other forms of racial discrimination in Oklahoma County." In support of this claim, Parks later proffered to the federal district court Professors Gross and Mauro's study, since published as Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization, 37 Stan.L.Rev. 27 (1984) (the Gross-Mauro Study).
 
 
 72
 The federal district court declined to hold an evidentiary hearing on the claim of racial discrimination in the application of Oklahoma's death penalty statutes. The judge was of the view that what may have happened in some other case didn't prove, or even tend to prove, what had occurred in Parks' case.
 
 
 73
 The conclusion of the Gross-Mauro study is that it is the color of the victim, rather than the color of the defendant, that impels a jury to more readily return a death penalty vis-a-vis a life sentence. In the instant case, the victim, Abdullah Ibrahim, was a native of Bangladesh temporarily in the United States, and he is not white-skinned, but, from the photograph in the record before us, is very dark-skinned. Under such circumstances, a court would be going far afield to hold an evidentiary hearing on the basis of the Gross-Mauro study. A Bangladesh victim does not appear to fall into place in the Gross-Mauro study.[9]
 
 
 74
 Moreover, the Supreme Court recently considered and rejected a similar claim in McClesky v. Kemp, --- U.S. ----, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In McClesky, a study similar to the Gross-Mauro study offered here was considered. That study (the Baldus study) purported to show a disparity in the imposition of the death penalty in the State there involved, Georgia, on the basis of the race of the murder victim.[10] McClesky there argued, as Parks does here, that the statistical disparities shown by the proffered study demonstrated that Georgia's capital punishment statute violated both the Equal Protection Clause of the Fourteenth Amendment and the Eighth Amendment's ban on "cruel and unusual punishments." See McClesky, 107 S.Ct., at 1770.
 
 
 75
 The Supreme Court rejected McClesky's Equal Protection Clause argument. It held that in order to prevail on the equal protection claim, McClesky had to "prove that the decisionmakers in his case acted with discriminatory purpose." McClesky, 107 S.Ct., at 1769 (emphasis in original). The Supreme Court examined the Baldus study and found it "clearly insufficient to support an inference that any of the decisionmakers ... acted with discriminatory purpose."[11] The Supreme Court also rejected McClesky's Eighth Amendment claim that his death sentence was excessive since racial considerations may have influenced capital sentencing decisions in Georgia. It found that at most, "the Baldus study indicates a discrepancy that appears to correlate with race," id., at 1777, and refused to assume that the unexplained discrepancy resulted from invidious racial discrimination. The Gross-Mauro study proffered here is similar to the Baldus study considered in McClesky. Like the Baldus study, it does not show what transpired in Parks' case. Nor does it demonstrate a "constitutionally significant risk" of racial discrimination.[12]
 
 
 76
 Parks has offered no evidence that would support an inference that the decision makers in his case acted with a discriminatory purpose. As indicated, such evidence is essential in order to prevail under the Equal Protection Clause. Parks' Eighth Amendment claim must also fail. He has not demonstrated a "constitutionally significant risk of racial bias." As the Supreme Court has observed, discrepancies in sentencing decisions appearing in studies such as the proffered Gross-Mauro study are but an inevitable part of our criminal justice system. See McClesky, supra, 107 S.Ct., at 1778.
 
 
 77
 Finally, the additional proffer by Parks that if given time he could "bring out evidence of other forms of racial discrimination in Oklahoma County" is conclusory and non-specific in nature, and did not require the district court to hold an evidentiary hearing. See Andrews v. Shulsen, 802 F.2d 1256, 1266 (10th Cir.1986) where we upheld a district court's ruling that an evidentiary hearing was unnecessary where the allegations of discrimination in fact were conclusory, stating that a "habeas petitioner must provide supporting factual allegations."
 
 
 78
 In sum, we think the defendant got a fair trial. Perhaps not a perfect one, but we know of no rule that in a capital case the trial must be perfect. Certainly there is nothing before us to indicate that the entire proceeding was fundamentally unfair, or that there has been a miscarriage of justice. Parks' defense, as stated, was an alibi. The jury rejected that defense. Accordingly, the facts and circumstances of the homicide, coming necessarily from only the state's evidence, showed a senseless, cold-blooded killing, the evidence therefor coming from the defendant himself. And, as previously stated, defense counsel did all he could do with what he had to work with.
 
 
 79
 Judgment affirmed.
 
 
 80
 McKAY, Circuit Judge, concurring in part and dissenting in part:
 
 
 81
 While I concur in parts II, V, VI, and VII of the majority's opinion, the issues raised in parts I, III, and IV compel me to dissent in this death penalty case.
 
 
 82
 The murder committed by Robyn Parks was, as all murders are, a personal tragedy for the victim's family and an affront to society's moral sensibilities. Yet, capital punishment is not the usual punishment inflicted in capital murder cases. As Justice Brennan recounted in 1972:
 
 
 83
 There has been a steady decline in the infliction of this punishment in every decade since the 1930's, the earliest period for which accurate statistics are available. In the 1930's, executions averaged 167 per year; in the 1940's, the average was 128; in the 1950's, it was 72; and in the years 1960-1962, it was 48. There have been a total of 46 executions since then, 36 of them in 1963-1964. Yet our population and the number of capital crimes committed have increased greatly over the past four decades.
 
 
 84
 Furman v. Georgia, 408 U.S. 238, 291, 92 S.Ct. 2726, 2753, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring) (emphasis added and footnote omitted). In the pre-Furman era, less than twenty percent of those convicted of murder were sentenced to death in those states that authorized capital punishment. See Woodson v. North Carolina, 428 U.S. 280, 295 n. 31, 96 S.Ct. 2978, 2987 n. 31, 49 L.Ed.2d 944 (1976). Even if current statistics regarding the rate of imposition of the death penalty in the post-Furman era would show a dramatic increase in its use, I have no doubt that the rate fails to approach by an exceedingly large margin the rate of homicides in this country. The disparity is for good reason. "[T]his most irrevocable of sanctions should be reserved for a small number of extreme cases." Gregg v. Georgia, 428 U.S. 153, 182, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976). The relatively low incidence of the death penalty as compared to the homicide rate in this country indicates that juries obviously agree with this proposition.
 
 
 85
 At common law, the death sentence was mandatory for all convicted murderers. In twentieth century America, the use of the death penalty was reduced both by narrowing the class of murders to which the penalty attached and by vesting the jury with discretion in the penalty's imposition. See Eddings v. Oklahoma, 455 U.S. 104, 110-11, 102 S.Ct. 869, 874-75, 71 L.Ed.2d 1 (1982); Gregg, 428 U.S. at 176-79, 96 S.Ct. at 2926-28. The Gregg Court rejected the notion that our "standards of decency had evolved to the point where capital punishment no longer could be tolerated." Id. at 179, 96 S.Ct. at 2928. However, the Court recognized that the penalty's imposition must be tailored so as to avoid arbitrary and capricious imposition based on irrelevant biases and prejudices. A death sentence imposed because of these impermissible considerations violates the eighth amendment. Even a cursory reading of the post-Furman cases reveals that, through principles enunciated in those cases, the Court has attempted to restrict the jury's attention only to those considerations that may properly impact on the individual sentencing determination before them. In fact, the issues in parts I and II that follow involve precisely such issues.
 
 
 86
 The evolution of capital punishment for the crime of murder thus evinces the conclusion that to be constitutional today, a death sentence must be closely intertwined with the facts of the murder and the propensities of the defendant and must not be actuated by extraneous influences. Although the jury may not be discriminatory, it is constitutionally bound to be discriminating. The decision to impose the death penalty in a particular murder case properly revolves around such parameters as the depravity of the murder (i.e., a torture-killing, multiple and hideous wounds, etc.) and the demonstrated violent propensities of the defendant. These are the types of factors that differentiate those "routine murder case[s]," Jackson v. Virginia, 443 U.S. 307, 328, 99 S.Ct. 2781, 2794, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring), that do not result in the imposition of the death sentence from those far fewer murder cases that do result in the death penalty.
 
 
 87
 In short, the post-Furman cases have established guidelines to ensure that juries do not impose the death sentence in the "routine murder case" but rather only in those extraordinary murder cases that warrant it. At bottom, though unarticulated, is a sense of proportionality in sentencing. When the death sentence is imposed in the "ordinary" murder case, the likelihood that impermissible factors influenced the sentencing determination is increased.
 
 
 88
 Along with those murders committed in the heat of passion by someone known to the victim, murder committed in the course of committing a robbery seems to me to epitomize the "run-of-the-mill" murder. The victim in this case was killed by a single gunshot wound to the chest, apparently when Mr. Parks attempted to buy gasoline with a stolen credit card. The facts do not indicate that Mr. Parks stopped at this station expressly to kill the attendant. There was no evidence of torture or other wounds. His only prior conviction was as a juvenile and involved a schoolyard scuffle. As unfortunate as these facts are, the imposition of the death sentence for this murder is disquieting, unless the death penalty is to be imposed in every murder case. Its imposition in this case thus requires close scrutiny to ensure that the jury's focus was properly channeled to only those considerations that may appropriately impact upon the sentencing determination.
 
 I.
 
 89
 I agree with defendant's contention that the prosecutor's remarks in the sentencing phase of the trial violated the principles articulated in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Supreme Court has recently interpreted Caldwell to prohibit those comments "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Darden v. Wainwright, 472 U.S. 320, 106 S.Ct. 2464, 2473 n. 15, 86 L.Ed.2d 231 (1986) (emphasis added). Near the close of his argument in chief, the prosecutor made the following remarks:
 
 
 90
 And then you may say, well, you know, yeah, I still mean it, I could, without doing violence to my conscience if this was a proper case; but, you know, I really don't want it on my hands that I had anything to do with anybody dying. So for that reason, although this is a proper case, I don't want to assess the death penalty because I just don't want to have to think about that. I don't want it on my conscience.
 
 
 91
 Well, I don't think it's on Robyn Parks' conscience that he took an innocent person's life away; and I don't believe in observing him throughout this trial and his testimony and listening to his voice on the tapes--I don't feel like there's the least bit of remorse in him over what he did. But, you know, as you as jurors, you really, in assessing the death penalty, you're not yourself putting Robyn Parks to death. You just have become a part of the criminal-justice system that says when anyone does this, that he must suffer death. So all you are doing is you're just following the law, and what the law says, and on your verdict--once your verdict comes back in, the law takes over. The law does all of these things, so it's not on your conscience. You're just part of the criminal-justice system that says when this type of type of [sic] thing happens, that whoever does such a horrible, atrocious thing must suffer death.
 
 
 92
 Now, that's man's law. But God's law is the very same. God's law says that the murderer shall suffer death. So don't let it bother your conscience, you know.
 
 
 93
 Record, vol. 6, at 707-08.
 
 
 94
 Such an argument was designed to do precisely that which Caldwell specifically prohibits: to allow the jurors to minimize their sense of personal responsibility for imposing the death sentence. "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell, 472 U.S. at 328-29, 105 S.Ct. at 2639-40. Such delegation of sentencing responsibility "presents an intolerable danger of bias toward a death sentence." Id. at 331, 105 S.Ct. at 2640.
 
 
 95
 The prosecutor's statements here freed the jurors from personal accountability for Mr. Parks' sentence of death by arguing that all the jury was doing in assessing the death penalty was following the mandates of the law. By implying that the law affirmatively prescribed the death penalty in this case, minimizing any sense of jury discretion in imposing the death sentence, the prosecutor allowed the jurors to feel as if their "hands were tied." He allowed them to feel as if they weren't choosing to impose the death penalty; the law required it. Portions of his argument merit repeating for illustration:
 
 
 96
 You just have become a part of the criminal-justice system that says when anyone does this, that he must suffer death.... [O]nce your verdict comes back in, the law takes over. The law does all of these things.... You're just part of the criminal-justice system that says when this type of type of [sic] thing happens, that whoever does such a horrible, atrocious thing must suffer death.
 
 
 97
 Record, vol. 6, at 707 (emphasis added). In essence, he told the jurors that they were not responsible for sentencing Robyn Parks to death; the ephemeral "criminal justice system" was responsible. The jurors were invited to shift, or at least diffuse, their sense of ultimate responsibility to "the law" that required them to sentence Mr. Parks to death.
 
 
 98
 The majority opinion finds the statements made in this case to be "quite similar," maj. op. at 1504, to those we found to be constitutional in both Dutton v. Brown, 812 F.2d 593 (10th Cir.1987) (en banc), and Coleman v. Brown), 802 F.2d 1227 (10th Cir.1986).[1] I very much disagree and set out in the margin the challenged statements made in those cases for comparison purposes.[2]
 
 
 99
 The prosecutor in Dutton attempted to define the juror's roles functionally instead of individually but did not minimize the juror's sense of responsibility within those roles. The remarks in Coleman stressed that the defendant was responsible for his own plight but did not intimate that the awesome responsibility of imposing the death sentence did not rest solely with the jury. The statements made in the present case were much more egregious, directed squarely at attempting to ameliorate any sense of accountability for the decision that this man must be executed.
 
 
 100
 Moreover, we found it critical in both Dutton and Coleman that the prosecutor made subsequent remarks stressing the importance and exclusivity of the jury's role in the sentencing determination. "It is clear that, when taken in context, the statement of the prosecutor was not constitutionally impermissible.... Indeed, the tenor of the remainder of the closing was that the crucial determination of punishment was the sole function of the jury." Dutton, 812 F.2d at 596-97 (emphasis added). "Moreover, viewing this argument in context, it is evident that the prosecutor had no intention of diminishing the jury's sense of responsibility." Coleman, 802 F.2d at 1241 (emphasis added). We quoted the prosecutor's subsequent remarks at length in our Coleman opinion. See id. In the present case, the prosecutor made no additional remarks that may have mollified his impermissible comments. He basically closed his argument in chief with the unconstitutional statements.
 
 
 101
 The Supreme Court's concluding statement in Caldwell is equally applicable in this case.
 
 
 102
 This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its "truly awesome responsibility." In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires.
 
 
 103
 Caldwell, 472 U.S. at 341, 105 S.Ct. at 2646.
 
 II.
 
 104
 The defendant challenges the following instruction given during the penalty phase: "You must avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence." The anti-sympathy instruction held constitutional in California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), informed the jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Id. at 839. The majority in this case notes that the present instruction does not include the word "mere" but cursorily concludes without explanation that "such, under Brown, does not dictate a reversal in the instant case." Maj. op. at 1505. By denigrating any significance in the additional word "mere" in the Brown instruction, this majority misses the thrust of the Supreme Court's analysis in upholding the instruction in that case. Moreover, the majority fails to consider the significance of the modifying phrase in the present instruction--"any influence of"--as it relates to the Brown analysis. Such modifiers as "mere" and "any," however, are critical to the analysis. In Brown, Justice Rehnquist wrote, "By concentrating on the noun 'sympathy,' respondent ignores the crucial fact that the jury was instructed to avoid basing its decision on mere sympathy." Id. at 840 (emphasis added only to "crucial fact"). Likewise, the majority in this case ignores the crucial fact that the jury was instructed to avoid basing its decision on any influence of sympathy.
 
 
 105
 Not all forms of sympathy are impermissible considerations in the sentencing decision. Only general feelings of sympathy not connected to the particular defendant and the evidence introduced are prohibited, for such would allow the imposition of the death sentence in an arbitrary and unpredictable fashion. The Brown court recognized that there are different "sorts" of sympathy and that sympathy tethered to evidence introduced during the penalty phase, such as evidence of a disadvantaged background or emotional problems, is a proper element for the jury to consider when deciding whether to impose the death penalty.[3] "We think a reasonable juror would ... understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." Id. at 840 (emphasis added). "[I]ndividualized consideration of mitigating factors," Lockett v. Ohio, 438 U.S. 586, 606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (emphasis added), is the key, which is why sympathy rooted in the evidence presented for a particular defendant is permissible whereas generalized, "untethered" sympathy is not. Cf. Eddings, 455 U.S. at 112-16, 102 S.Ct. at 875-78 (evidence of turbulent family history, of beatings by a harsh father, and of serious emotional disturbance proper consideration in assessing death penalty); Woodson, 428 U.S. at 303, 96 S.Ct. at 2990 (must allow "particularized consideration of relevant aspects of the character and record of each convicted defendant"). The entire thrust of the majority's opinion in Brown was that an instruction prohibiting "mere sympathy" sufficiently conveyed that critical distinction to the jury. The majority and dissent in Brown parted ways not on the assumption that sympathy rooted in evidence is a proper consideration in sentencing, but rather on whether the instruction at issue sufficiently instructed the jury regarding the difference between "tethered" (permissible) and "untethered" (impermissible) sympathy. See Brown, 107 S.Ct. at 843 (Brennan, J., dissenting).[4]
 
 
 106
 The instruction in the instant case fails to differentiate that sympathy which may permissibly impact upon the sentencing decision from that which may not. It prohibited "any influence of sympathy," which is qualitatively quite different from avoiding "mere sympathy." It forecloses any possibility of considering sympathy of any sort and is thus distinguishable on a critical point--the point on which the Supreme Court's analysis was founded--from the instruction narrowly condoned in Brown. By prohibiting consideration of all sorts of sympathy, the instruction violated Eddings, Lockett, and Woodson and hence fails constitutional muster. Moreover, the instructions given as a whole failed to cure this fatal defect. See Brown, 107 S.Ct. at 839 (if specific instruction fails, must then review entire charge to determine whether it delivered a correct interpretation of the law).
 
 
 107
 The damage is particularly acute in this case because the only mitigating evidence presented was testimony from defendant's father with respect to defendant's difficult childhood spent in various relatives' homes and his generally nonviolent nature. The jury was instructed to ignore any influence of sympathy--presumably even that sympathy tethered to this testimony, defendant's sole mitigating evidence. It is constitutionally impermissible to prohibit the jury from considering, relative to the individual offender, those "compassionate or mitigating factors stemming from the diverse frailties of humankind." Woodson, 428 U.S. at 304, 96 S.Ct. at 2991. Brown v. California does not shield such an instruction.
 
 III.
 
 108
 The defendant requested and was denied a lesser included offense instruction for second degree murder involving homicide while committing the felony of using a fraudulent credit card. Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), provides that there is a constitutional right, at least when the death penalty is imposed, to a lesser offense instruction warranted by the evidence. See generally Trujillo v. Sullivan, 815 F.2d 597, 600-04 (10th Cir.1987) (discussing whether Beck extends the constitutional right to cases in which the death penalty is not imposed). As a matter of federal constitutional law, Mr. Parks was thus entitled to his instruction as long as there was evidence before the jury to support it, whether or not the Oklahoma courts would apply a stricter standard for the giving of such an instruction under state law.[5]
 
 
 109
 The majority concludes that defendant's alibi defense precludes any lesser offense instruction, implying that any evidence in the record supporting a lesser offense instruction must come from the defendant to entitle him to the instruction. "Parks testified in his own behalf and denied killing Ibrahim, testifying that he was elsewhere at the time of the homicide. So, there is nothing in defendant's testimony that would justify giving an instruction on second-degree murder." Maj. op. at 1501 (emphasis added).
 
 
 110
 I simply find no law for this proposition, and I think it would be a bad rule to write. Anytime a defendant honestly denied participation in a crime, he or she would automatically forego the right to an instruction on a lesser offense supported by other evidence before the jury. Even if the evidence, albeit from a source other than the defendant, were overwhelming that a lesser offense was committed, no instruction could be given unless the defendant, possibly perjuring himself or herself, admits some participation in the incident. Fearing conviction of the greater offense even though innocent, a defendant is caught between maintaining his or her innocence, risking such a conviction, and falsely admitting participation so as to gain a lesser offense instruction. Such coercion is constitutionally untenable. If the evidence of a lesser offense is before the jury, defendant's entitlement to a lesser offense instruction should not depend upon whose witness introduced the evidence. A jury could reject the defendant's alibi defense but accept that the evidence supports conviction on the lesser offense rather than the greater.
 
 
 111
 There was sufficient evidence before the jury in this case to support a lesser offense instruction. The two taped telephone conversations around which the prosecution's entire case revolved furnished evidence sufficient to give an instruction that the homicide was committed while using a stolen credit card. See ct. ex. 1, 2, record, vol. 5. (And, in a sense, the evidence did come from the defendant through his taped conversations.)
 
 
 112
 In meeting this evidence, the majority does what is solely within the jury's province to do. It interprets the evidence as showing that the felony of using a stolen credit card was completed and only "thereafter" did Mr. Parks form "a deliberate intent to kill." Maj. op. at 1501. Whether the predicate offense supporting the second degree murder charge ended the moment Mr. Parks paid for the gasoline but before he left the station so that any action "thereafter" was not connected to the offense or actuated by the offense is a matter for the jury in deciding whether to convict on the lesser offense--an option the jury was never given in this case. Indeed, whether in fact the killing occurred after defendant completed the credit card transaction is not clear from the evidence and is a fact appropriately determined only by the jury. These are not matters to be decided in evaluating whether there was sufficient evidence supporting an instruction.
 
 
 113
 We need not be convinced that the crime committed was second degree murder rather than first degree murder. That differentiation is for the jury to make. Our job is merely to consider whether there was sufficient evidence in the record, from whatever source, to justify at least giving the instruction. The majority, rather than examining the record evidence of second degree murder to determine its existence for purposes of instruction, has evaluated such evidence and rejected it in favor of the evidence supporting first degree murder. That is an usurpation of the jury's function.
 
 
 114
 Moreover, the assertion that there was no evidence in the record of homicide while committing the felony of using a fraudulent credit card is at direct odds with the trial court's instructions in the penalty phase regarding the applicable aggravating circumstances. The Bill of Particulars read to the jury asserted the following as an aggravating circumstance supporting the imposition of the death penalty:
 
 
 115
 The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. Defendant had been in the service station attended by victim. Victim took down Defendant's tag number. Defendant suspicioned [sic] victim was going to call the law as soon as he left. Defendant felt if he killed the victim there would be nothing the victim could tell the police and he would not be apprehended.
 
 
 116
 Record, vol. 6, at 661. This allegation in the Bill and the court's ensuing instruction on this aggravating circumstance were consistent with the single theory advanced by the prosecution throughout both the guilt phase and sentencing phase of Mr. Parks' trial: that Robyn Parks had killed in the course of using a stolen credit card in order to avoid arrest for that crime. See, e.g., record, vol. 6, at 185-86, 631-32, 661, 697-700, 708; ct. ex. 1, record, vol. 5, at 2-3, 12. This aggravating circumstance was the only one found by the jury to be applicable beyond a reasonable doubt in this case. The jury rejected as aggravating circumstances: (1) the murder was especially heinous, atrocious and cruel; and (2) there existed a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.
 
 
 117
 The trial court evidently found sufficient evidence in the record to support submitting the "avoiding lawful arrest" aggravating circumstance instruction. Yet, now the majority asserts that there was no evidence supporting the requested lesser offense instruction based on that same evidence. I cannot fathom how we can uphold the jury's imposition of the death sentence based on the sole aggravating circumstance quoted above while at the same time rule that there was no record evidence supporting the requested lesser offense instruction. The same theory and evidence go toward both the aggravating circumstance instruction and the lesser offense instruction.
 
 
 118
 [S]tates cannot fairly employ critical evidence to gain their own ends and, at the same time, deny its probative use to defendants. Nor can they fairly profess to doubt the sufficiency of evidence and then assert, in the same breath, that it can be found adequate to support imposition of the ultimate sanction.
 
 
 119
 Brief for Petitioner-Appellant at 22. As Justice Brennan once wrote, "The Government cannot have it both ways in the same case." Kennedy v. Mendoza-Martinez, 372 U.S. 144, 195, 83 S.Ct. 554, 581, 9 L.Ed.2d 644 (1963) (Brennan, J., concurring).
 
 
 120
 Finally, the cases cited by the majority are not persuasive. In Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the defendant was released on parole and, according to his own testimony, embarked on a two month, cross-country crime spree, committing about thirty armed robberies, nine kidnappings, and two extortions in seven states. During a robbery of a pawnshop, the owner dropped to his hands and knees and crawled toward his office when the defendant shot him in the back, killing him. After capture, the defendant signed a written confession admitting everything. He testified before the grand jury and confessed "that [the victim] was not the only person he had ever killed, that he felt no remorse because of that murder, that he would kill again in similar circumstances, and that he intended to return to a life of crime if he was ever freed." Id. at 607, 102 S.Ct. at 2050. He requested before the grand jury that he be executed as soon as possible.
 
 
 121
 Because Alabama law required a jury trial as a prerequisite for the imposition of the death penalty, the prosecutor rejected defendant's guilty plea. Against his attorney's advice, defendant testified during his subsequent trial, admitting everything as before the grand jury and stating, "I would rather die by electrocution than spend the rest of my life in the penitentiary. So, I'm asking very sincerely that you come back with a positive verdict for the State." Id. at 607-08, 102 S.Ct. at 2050-51. The jury returned a guilty verdict in less than fifteen minutes, and the defendant was sentenced to death.
 
 
 122
 Only after defendant's mother initiated habeas proceedings did defendant change his attitude of desiring execution. The Alabama statute under which he was sentenced to death was the same that was shortly thereafter found unconstitutional in Beck v. Alabama because it absolutely precluded jury consideration of any lesser included offense in a capital case--even if warranted by the evidence. Mr. Hopper did not claim that there was record evidence supporting a lesser offense instruction and that he was therefore prejudiced. Rather, he asserted that because the statute was unconstitutional on its face, his conviction must be automatically set aside.
 
 
 123
 The Supreme Court ruled against Mr. Hopper, stating that Beck held only that "due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction." Id. at 611, 102 S.Ct. at 2053. The statute under which defendant was convicted required an intent to kill. The lesser offense that he asserted should have been considered by the jury applied only when a defendant lacked an intent to kill. The defendant's testimony absolutely precluded a conclusion that the murder committed was unintentional as opposed to intentional, and there was no evidence from any other source conflicting with the defendant's testimony and supporting a lesser offense instruction.
 
 
 124
 The unusual and particularly one-sided record in Hopper is distinguishable, as the rather elaborate recitation of the facts above indicates, from the present record. In this case, the defendant's proffered testimony did not support the lesser offense instruction, but his testimony (taped telephone conversations) proffered by the state was sufficient evidence contradicting such testimony to warrant the instruction. Hopper was not decided on the basis that the defendant himself failed to come forward with evidence supporting a lesser offense instruction. It does not stand for the proposition that such evidence must come from the defendant. Rather, it stands for the proposition that when no evidence supports such an instruction, one need not be given just because the case is a capital case.
 
 
 125
 Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), is equally inapposite. No lesser offense instruction was required in that case because as a matter of law there was no lesser offense on which to instruct. The statute of limitations had run on the lesser offense. The court did not rule that there was no factual basis in the record to support a lesser offense instruction.
 
 IV.
 
 126
 The Supreme Court "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' " Caldwell, 472 U.S. at 329, 105 S.Ct. at 2639 (quoting California v. Ramos, 463 U.S. 992, 998-99, 103 S.Ct. 3446, 3451-52, 77 L.Ed.2d 1171 (1983)). In my view, exacting scrutiny of the issues embraced in sections I and II of this dissent--issues which directly impacted upon the capital sentencing determination--require vacation of the death sentence in this case. Furthermore, due process requires that defendant's conviction for first degree murder be reversed. On retrial, the evidence shows he is entitled to a lesser offense instruction for second degree murder.
 
 
 127
 This matter comes on for consideration of petitioner-appellant's petition for rehearing and suggestion for rehearing en banc. The majority opinion and Judge McKay's partial concurrence and partial dissent were filed on July 15, 1987, and appeared in the advance sheet of 823 F.2d at 1405-29. The opinion was withdrawn from the bound volume pending the Court's further order on petitioner-appellant's petition for rehearing and suggestion for rehearing en banc.
 
 
 128
 The panel unanimously substitutes a revised "Section V" for the original "Section V" in the panel opinion filed July 15, 1987. With the original opinion thus modified, the panel majority votes to deny the petition for rehearing. Judges McWilliams and Baldock vote to deny the petition for rehearing while Judge McKay voted to grant the petition for rehearing. Judge Baldock's vote to deny the petition for rehearing is accompanied by his partial explanation which is attached to this order.
 
 
 129
 The suggestion for rehearing en banc has received the votes of a majority of the judges of the court in regular active service insofar as argument I contained in petitioner-appellant's petition for rehearing. Petitioner-Appellant's Petition for Rehearing with Suggestion for Rehearing En Banc at iv. On all other issues contained in the petition, the suggestion for rehearing en banc has failed to receive the votes of the majority of the judges of the court in regular active service. Briefs should be submitted concerning the following issues:
 
 
 130
 1. Whether the prosecutor's summation in the penalty phase concerning juror responsibility diverted the jury from considering the full extent of its responsibility for determining the life or death sentence?
 
 
 131
 2. Whether the penalty phase instruction "You must avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence," influenced the jury to improperly discount mitigating evidence presented by the defendant?
 
 
 132
 3. Whether the combination of the prosecutor's comments ("You leave the sympathy, and the sentiment and prejudice part out of it.") concerning the above instruction and the instruction itself, and the absence of any corrective instruction after the arguments under Okla.Stat.Ann. tit. 22, Sec. 831(6) (West 1986), influenced the jury to improperly discount mitigating evidence presented by the defendant?
 
 
 133
 The briefs shall be served and filed as follows:
 
 
 134
 1. Appellant's opening brief shall be served and filed within 20 days of the date of this order.
 
 
 135
 2. Appellees' answer brief shall be served and filed within 20 days of the date of service of Appellants' brief.
 
 
 136
 3. Appellant may serve and file a reply brief within 10 days of the date of service of Appellees' answer brief.
 
 
 137
 4. All briefs shall be filed and served in person or by an overnight delivery service. Fed.R.App.Proc. 26(c) shall not be applicable.
 
 
 138
 Oral argument shall be heard at the May 1988 Term of Court on Thursday, May 5, 1988.
 
 ON PETITION FOR REHEARING
 
 139
 BALDOCK, Circuit Judge.
 
 
 140
 The petition for rehearing largely restates the position of the dissenting member of the panel. Accordingly, there are two points concerning the refusal of the state trial court to instruct on second-degree murder[1] which I deem necessary of further comment. The dissent states:
 
 
 141
 The majority concludes that defendant's alibi defense precludes any lesser offense instruction, implying that any evidence in the record supporting a lesser offense instruction must come from the defendant to entitle him to the instruction. "Parks testified in his own behalf and denied killing Ibrahim, testifying that he was elsewhere at the time of the homicide. So, there is nothing in defendant's testimony that would justify giving an instruction on second-degree murder." Maj. op. at 1501 (emphasis added).
 
 
 142
 Concurrence and Dissent (hereinafter referred to as the Dissent) at 1518. As a threshold matter, this analysis of the majority opinion is inaccurate because the majority did not conclude that the defendant's alibi defense, by itself, precluded any lesser offense instruction.[2] We merely remarked that there was nothing in defendant's testimony which would justify giving a lesser offense instruction. That is not to say we did not consider the other evidence upon which a lesser included offense instruction might be based. To the contrary, in the very sentence following the one quoted by the dissent, we acknowledged that other evidence and found it insufficient in this case.
 
 
 143
 The evidence which counsel relies on in advancing the present argument are the statements made by the defendant to Clegg in the two tape-recorded telephone conversations, particularly the first of the two conversations. We do not agree that these statements made by Parks to Clegg required an instruction to the jury on second-degree murder.
 
 
 144
 Majority Opinion at 1501. Thus, we did not purport to adopt a rule, either directly or by implication, which would require a defendant to testify in order to receive a lesser offense instruction.
 
 
 145
 In this case, as in others, the test is one of sufficiency of the evidence to warrant such an instruction: "the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973) (emphasis added). The purpose of constitutionally requiring a lesser offense instruction when the evidence so warrants is to enhance the rationality and reliability of the jury's deliberations. Spaziano v. Florida, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984). If, after viewing the evidence in its entirety, there is insufficient evidence to warrant a lesser offense instruction, the defendant would not be entitled to such an instruction because the lesser offense option would diminish, rather than augment, the rationality of the jury process. See id.
 
 
 146
 Thus, I cannot agree with the dissent's characterization of our holding on this issue. I fail to see how any reading of the majority opinion would permit an implication that in order for there to be an instruction on a lesser offense, testimony requiring such an instruction must come from the defendant himself. Further, a defendant may deny participation in a crime and still be entitled to a lesser offense instruction provided the evidence, from whatever source, would enable the jury to rationally convict the defendant of the lesser offense. The evidence in this case simply is insufficient to warrant an instruction on the offense of second-degree murder in the course of committing a credit card felony.
 
 
 147
 As a preliminary matter, I note the state trial judge's concern about the lack of physical evidence supporting a lesser offense theory. For example, no credit card or imprinted charge slip was introduced.[3] Nor is there any evidence in the record concerning the rightful owner of such a credit card. This lack of evidence is not surprising, because the defense made a tactical decision to pursue an alibi defense and did not introduce any evidence tending to show that a second-degree murder in the course of possessing a stolen credit card occurred. Neither did the defendant elicit any information from the state's witnesses concerning this theory. Questioned by his retained counsel, the defendant attempted to convince the jury that he was uninvolved with any credit card transaction, stolen or otherwise:
 
 
 148
 Mr. Hood: Okay, Now have you ever used a credit card to do business, any retail business at all?
 
 
 149
 Defendant: No.
 
 
 150
 Mr. Hood: Have you ever applied for a credit card?
 
 
 151
 Defendant: No.
 
 
 152
 Mr. Hood: Have you ever had one in your possession?
 
 
 153
 Defendant: No.Mr. Hood: Have you ever used any other person's credit card to make a purchase?
 
 
 154
 Defendant: No.
 
 
 155
 Mr. Hood: All right. When you bought gas, did you pay cash?
 
 
 156
 Defendant: Yes.
 
 
 157
 Rec. vol. VI, tr. vol. III at 486, 524. Only the defendant's taped statements would possibly furnish the basis for a claim that a lesser offense instruction is warranted; however, a close look at the statements indicates that they are totally consistent with the first-degree murder conviction.
 
 
 158
 The state's theory was that defendant committed murder with malice aforethought, malice being defined as the "deliberate intention unlawfully to take away the life of a human being...." Okla.Stat. tit. 21 Sec. 701.7 (1981). Defendant claims the evidence warranted an instruction on the theory of a second-degree murder, Okla.Stat. tit. 21, Sec. 701.8 (1981), during the commission of the felony of taking or receiving a stolen credit card, Okla.Stat. tit. 21 Sec. 1550.22 (1981). An important distinction between the state's first-degree theory and the defendant's second-degree theory concerns defendant's state of mind. The defendant's second-degree theory envisions murder without malice aforethought (or unintentional murder) during the commission of the felony of unlawful possession of a credit card. But the defendant's taped statements to informant Clegg do not support such a second-degree theory--to the contrary, these statements are completely consistent with a deliberate killing. Stated another way, the defendant's statements, although they mention a stolen credit card, do not rise to the level of creating a factual dispute concerning whether the murder was deliberate or unintentional. See Sansone v. United States, 380 U.S. 343, 350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965) ("A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense.")
 
 
 159
 I have listened to the tapes and reviewed the transcripts, and where the tapes and transcripts differ, I have relied on the tapes themselves.[4] In my view, only one tape furnishes an arguable basis for a second-degree murder instruction. The defendant told Clegg that the victim was standing straight up when he shot him and that the victim had not sounded any alarm. The conversation continued:
 
 
 160
 Defendant: I went there with a credit card, a gas credit card. You see what happened, he come, after I give him the credit card he comes out the booth and comes back and look at my tag number.
 
 
 161
 Clegg: Uh-huh.
 
 
 162
 Defendant: So I know then that if he get the tag number, as soon as I leave he gonna call the law.
 
 
 163
 Clegg: Oh.
 
 
 164
 Defendant: Alright?
 
 
 165
 Clegg: Uh-huh.
 
 
 166
 Defendant: O.K. he gonna call the law, I got them guns, the dynamite and everything in my trunk, right?
 
 
 167
 Clegg: Yeah, I didn't know that.
 
 
 168
 Defendant: I ain't gonna get too far before they get on me ...
 
 
 169
 Clegg: Uh-huh.
 
 
 170
 Defendant: So I said the way to do that if he don't be around then ain't nothin he can tell them no way.
 
 
 171
 Clegg: So you took--
 
 
 172
 Defendant: I wasn't going there for what people thought it was.
 
 
 173
 Clegg: Oh, is that right?
 
 
 174
 Defendant: Right, I was there to use that credit, that gas credit card.
 
 
 175
 Clegg: Damn boy, boy you somethin' else, you somethin' else man.
 
 
 176
 Defendant: No, but see, that's what people fail to realize. See if he'd a told on me, see I woulda went anyway. See what I'm sayin'?Clegg: Yeah.
 
 
 177
 Defendant: And, I just looked at it I might as well, if I'm go, let me go for being a dumb son of a gun, you know a little funky gas credit card.
 
 
 178
 * * *
 
 
 179
 Defendant: I didn't take a dime. You know, cause I didn't come there to take no dime, I come there to get me some gas and then when he got my number I said man, if I leave, I say, I won't be two blocks before they be on me cause he goin', he goin' tell it that I got, you know a hot credit, gas credit card. I say ...
 
 
 180
 Clegg: An' you did, I say one thing, you did it without witnesses and I guess that's the way ...
 
 
 181
 Defendant: Huh?
 
 
 182
 Clegg: I guess if you goin' to kill somebody, I guess that's the way to do 'em.
 
 
 183
 Defendant: Yeah, let you and them be there. You know, you don't need no ten niggers with you to do nothin' ...
 
 
 184
 Clegg: No.
 
 
 185
 Defendant: Just you and them and then you ain't got nothin' to worry about.
 
 
 186
 Rec. vol. V, ct. ex. 39; see also ct. ex. 1 at 2-3, 12. These statements, which were later disclaimed by defendant at trial as complete fabrications,[5] indicate that the defendant contemplated the murder. Twice he remarked that he was going to leave the station after using the credit card. His concern was to avoid apprehension after he left the gas station, and to that end he made a calculated decision to kill the attendant. These statements fully support a deliberate murder, notwithstanding that a credit card may have been involved.
 
 
 187
 The dissent maintains that the jury should have been allowed to determine whether the murder was committed in the course of the felony of possessing a stolen credit card and that the majority has invaded the province of the jury by evaluating the evidence and accepting only that evidence tending to support a first-degree murder. Dissent at 1518-19. I must disagree with this characterization. I have searched the record and simply have found a lack of evidence from which a jury could rationally conclude that an unintentional murder occurred, even if a credit card was involved.
 
 
 188
 The dissent also suggests that the determination that defendant was not entitled to a lesser offense instruction on his second-degree murder theory is inconsistent with a penalty phase instruction on the aggravating circumstance of killing to avoid or prevent a lawful arrest or prosecution. But, the facts needed to suggest second-degree murder are not identical with those suggesting the aggravating circumstance. The state's theory, supported by defendant's own admissions on the tapes, was a deliberate murder to avoid arrest for possession of a stolen credit card, weapons and dynamite. The aggravating circumstance allowing the death penalty was that the murder was committed to avoid or prevent lawful arrest or prosecution. In marked contrast, the second-degree murder theory advanced by defendant envisions a non-deliberate homicide committed during the felony of possessing a stolen credit card. Such a theory was not defendant's account on the taped telephone conversation and it was not his account at trial. The state did not attempt to "have it both ways in the same case." Dissent at 1519-20 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 195, 83 S.Ct. 554, 581, 9 L.Ed.2d 644 (1963) (Brennan, J., concurring)). Accordingly, I vote to deny rehearing.
 
 
 
 [1]
 At the penalty phase, the State sought three statutory aggravating circumstances. First, the State alleged that the murder was especially heinous, atrocious, or cruel. Second, the State alleged that the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution. Third, the State alleged the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. The jury found only the second statutory aggravating circumstance charged, i.e., that the murder was committed to avoid or prevent a lawful arrest or prosecution
 
 
 [2]
 The judge stated:
 As a matter of fact, the defendant's own testimony was that he didn't even own a credit card. But even in the State's case there was no evidence of a credit card, except his statements and his statements alone do not prove the corpus delecti of the crime. There is no corpus delecti of any other felony having been committed. ... There is no evidence and, consequently, it's Murder One or nothing.
 
 
 [3]
 This holding is consistent with other pronouncements of the Oklahoma courts. See e.g., Irvin v. State, 617 P.2d 588, 596 (Okla.Crim.App.1980) (where no evidence supports requested second-degree murder instruction, unnecessary to instruct thereon); Seegars v. State, 655 P.2d 563 (Okla.Crim.App.1982)
 
 
 [4]
 In Palmer v. State, 327 P.2d 722 (Okla.Crim.App.1958), the Oklahoma court held that it was not error to refuse to give a lesser included offense instruction where the state made out a prima facie case of the greater offense, and there was "no evidence whatever to refute the allegations of the information...." In order to justify or require the giving of a lesser included offense instruction, there must be "evidence sufficient to raise the issue ...." 327 P.2d, at 726
 
 
 [5]
 Although the fact of the robbery conviction was admitted by Parks on direct examination, the conviction's underlying facts were not presented to the jury at that time. On objection of the prosecutor, the state trial court ruled that Parks' testimony regarding the circumstances surrounding the robbery conviction was incompetent at that stage. The prosecutor did not pursue the robbery conviction on cross-examination
 
 
 [6]
 With regard to nonstatutory mitigating circumstances, Parks' jury was instructed as follows:
 You are not limited in your consideration to the minimum mitigating circumstances set out herein, and you may consider any other or additional mitigating circumstances, if any, that you may find from the evidence to exist in this case. What facts or evidence that may constitute an additional mitigating circumstance is for the jury to determine.
 In Brown, the jury there was instructed that it could consider nonstatutory mitigating circumstances as follows:
 Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.
 Justice O'Conner was concerned that the jury may have understood this instruction to limit its consideration of nonstatutory mitigating factors to evidence about the circumstances of the crime, and to preclude consideration of evidence about the defendant's character and background. See Brown, 107 S.Ct., at 842 (concurring opinion). The instruction given here, however, does not so limit the jury's consideration.
 
 
 [7]
 The Supreme Court has stated that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." Zant v. Stephens, 462 U.S. 862, 875 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983). In Andrews v. Shulsen, 802 F.2d 1256 (10th Cir.1986), also a death penalty case, we recently observed that "sentencing authorities may determine a defendant's fate without regard for burdens of proof or other measures of certainty." 802 F.2d, at 1264. See also Ford v. Strickland, 696 F.2d 804, 817-19 (5th Cir.1983) (opinion of Roney, J.) (burden of proof argument confuses proof of facts and weighing of facts in sentencing; weighing process not a fact susceptible of proof under any standard); Sonnier v. Maggio, 720 F.2d 401, 408 (5th Cir.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984); Foster v. Strickland, 707 F.2d 1339, 1345 (11th Cir.1983)
 
 
 [8]
 We have examined the cases from other Circuits relied upon by the petitioner, and have determined that they do not support his position. See e.g. Peek v. Kemp, 784 F.2d 1479 (11th Cir.1986) (en banc), cert. denied, --- U.S. ----, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); Spivey v. Zant, 661 F.2d 464 (5th Cir. Unit B 1981), cert. denied, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982). In Peek, the Eleventh Circuit held that the constitution requires only that there be "no reasonable possibility" that a juror will fail to understand "the meaning and function of mitigating circumstances." 784 F.2d, at 1494. In Andrews v. Shulsen, 802 F.2d 1256 (10th Cir.1986), we recently stated that sentencing instructions need only instruct the jury that "the law recognizes circumstances which may be considered as extenuating or otherwise reducing a defendant's culpability and hence his punishment." 802 F.2d, at 1264. In the instant case, the state trial judge's instructions on mitigating circumstances were lengthy and thorough. The jury's attention was clearly focused on the possible existence of mitigating circumstances, and, in Instruction No. 7, the jury was instructed as to its role in the sentencing decision. There is no reasonable possibility that Parks' jury failed to comprehend the nature and function of mitigating circumstances in reaching its decision
 
 
 [9]
 The Gross-Mauro study itself states that "cases involving Asian or American Indian defendants or victims have been removed from any tabulations that include the racial characteristics of the defendants or of the victims, respectively, from all regression analyses, and from tabulations involving our scale of aggravation." Patterns of Death, 37 Stan.L.Rev., at 52 (footnote omitted)
 
 
 [10]
 The Baldus study also purported to show a disparity in the imposition of the death penalty based on the race of the defendant, although to a lesser extent. In contrast, the Gross-Mauro study here at issue indicates that, in Oklahoma, the race of the suspect did not have a statistically significant role in the imposition of the death penalty. See Patterns of Death, 37 Stan.L.Rev., at 97 n. 187
 
 
 [11]
 At an evidentiary hearing, McClesky's expert witness testified that the Baldus study did not show what occurred in any given case. McClesky, 107 S.Ct., at 1767 n. 11
 
 
 [12]
 The Gross-Mauro study concluded that in Oklahoma, "the odds of receiving the death penalty for killing a white were 4.31 times greater than the odds of receiving the death penalty for killing a black." Patterns of Death, 37 Stan.L.Rev., at 96 n. 184. This figure is substantially identical to that which the Supreme Court characterized as "not demonstrat[ing] a constitutionally significant risk of racial bias...." McClesky, 107 S.Ct., at 1767
 
 
 [1]
 The majority also notes that "[t]here was no objection by defense counsel to the prosecution's argument." Maj. op. at 1504. In Dutton, there also was no objection at trial; in fact, the issue was not pursued at any time in the appellate process. The issue was raised for the first time in the habeas proceedings. However, the en banc court found cause for the procedural default because the trial occurred in 1979, six years prior to Caldwell in 1985. The court stated that counsel "could not have known that the prosecutor's remarks might have raised constitutional questions." Dutton, 812 F.2d at 596. Robyn Parks' trial occurred in 1978, seven years before Caldwell and even a year before Dutton. Considering the en banc court's treatment of this problem in Dutton, it seems disingenuous to me to apparently fault counsel in this case for not objecting at trial. At least he had the foresight, unlike counsel in Dutton, to pursue the issue on direct appeal
 
 
 [2]
 The challenged statements in Dutton were as follows:
 First of all, [Defense Counsel] argues that the final decision is yours, and of course, to some degree it is. But you are, as I am, as Judge Theus is, as all the courts are, part of the process. We are not functioning as individuals. I am not here as Andy Coats. I am here as the District Attorney.
 And you are not here in your individual capacities. You are here as the jury. And Judge Theus is not our good friend, Harold, off the Bench. He is his Honor, Judge Harold Theus, when he is in this Courtroom.
 And we are all part of the law and it is the law that makes us work. So it has to be in that attitude, in that frame of mind, that you approach the problem.
 Dutton, 812 F.2d at 596.
 The challenged statements in Coleman were as follows:
 In closing I say to you that they try to put the responsibility on you, like it's all your fault. To a certain extent--I don't mean to imply, I don't mean to imply that it's put on you like it's your fault if you do something in this case. I don't mean to imply that necessarily, but let me make it real clear that you're not writing the verdict in this case. Don't--don't be mistaken into believing that it's your responsibility that this happened, that you're, you're writing the verdict. I, I say to you, this man wrote the verdict on February 9th, and all those days after when he got out of jail and went on [sic] spree of knifing and kidnapping and killing. He wrote the verdict. This man. He wrote it in blood over and over.
 Coleman, 802 F.2d at 1240.
 
 
 [3]
 Even the State in Brown acknowledged that sympathy for the defendant is an appropriate consideration in sentencing. It only argued, and the majority of the Court agreed, that the anti-sympathy instruction there given "simply prevent[ed] the jury from relying on 'untethered sympathy' unrelated to the circumstances of the offense or the defendant." Brown, 107 S.Ct. at 843 (Brennan, J., dissenting)
 
 
 [4]
 Although Justice O'Connor concurred in the majority opinion, resulting in a 5-4 decision upholding the instruction, she also submitted a concurring opinion in which she voiced concern over the collective effect of the court's instructions and the prosecutor's closing arguments. She was troubled that the prosecutor "may have suggested to the jury that it must ignore the mitigating evidence about the respondent's background and character." Brown, 107 S.Ct. at 842 (O'Connor, J., concurring)
 Along a similar vein, I am concerned that the prosecutor's admonitions that the jury must avoid all sympathy, in tandem with the court's overreaching sympathy instruction, created a " 'legitimate basis for finding ambiguity concerning the factors actually considered by the' jury." Id. (citation omitted). In rebuttal to the defense's arguments, the prosecutor stated:
 His closing arguments are really a pitch to you for sympathy--sympathy, or sentiment or prejudice; and you told me in voir dire you wouldn't do that.
 Well, it's just cold turkey. He either did it or he didn't. He either deserves the death penalty or he doesn't, you know. You leave the sympathy, and the sentiment and prejudice part out of it.
 Record, vol. 6, at 725-26. The prosecutor's remarks buttress the court's over-inclusive sympathy instruction and, while not sufficient in themselves to warrant reversal, further undermine the reliability of the death sentence imposed in this case.
 
 
 [5]
 Although not controlling in a federal constitutional analysis, Oklahoma state law is, in fact, very permissive in this regard. Under Oklahoma law, a defendant is entitled to instructions on every lesser offense that the evidence reasonably suggests. See McCullough v. State, 669 P.2d 311, 312 (Okla.Crim.App.1983). Oklahoma extends the right even where supporting evidence is "slight," resolving all doubts in favor of the accused. See Dennis v. State, 561 P.2d 88, 94 (Okla.Crim.App.1977); Morgan v. State, 536 P.2d 952, 956 (Okla.Crim.App.1975)
 The federal district court in this case relied in part on another Oklahoma case, Palmer v. State, 327 P.2d 722 (Okla.Crim.App.1958), in concluding that "in order to justify the instruction on second-degree murder, [the evidence] must 'raise the issue of whether the defendant was guilty of the lesser offense only.' " Maj. op. at 1500 (quoting district court). The majority opinion does not rely on the district court's analysis in reaching the same result. However, because I reject the majority's analysis, I must address the alternative analysis ostensibly supporting that result. While I could simply and easily rely on the assertion made above in the text that federal constitutional requirements override Oklahoma state law as interpreted by the district court, I feel compelled to refute this troublesome, and I believe erroneous, interpretation of Oklahoma law.
 The defendant in Palmer was convicted of the felony of leaving the scene of an accident involving personal injury. He alleged error in the trial court's failure to instruct on the misdemeanor of leaving the scene of "an accident resulting only in damage to a vehicle." Id. at 724 (quoting applicable Oklahoma statute) (emphasis added). The words defining the lesser offense required that there be no personal injury but only property damage in order for the statute to be violated. Because there clearly was record evidence that the accident at issue resulted in personal injury, there was no record evidence that the misdemeanor had been committed. The trial court's refusal to instruct on the lesser offense was thus upheld on the well-accepted grounds that there must be some evidence in the record supporting the lesser offense in order to justify a lesser offense instruction. The word "only" was significant in that case solely because the lesser offense statute employed it in defining the offense itself. Palmer is thus a unique case confined to its particular facts and to offenses that are similarly defined in restrictive terms.
 In failing to recognize the uniqueness of the statutory definition of the lesser offense in Palmer, the district court imported the word "only" into every lesser offense definition. By so doing in this case, the district court in effect judicially engrafted a new element onto a second degree murder offense--that the greater intent of malice required for first degree murder be positively disproved. Absent evidence showing that "only" the lesser offense was committed, no lesser offense instruction is necessary under the district court's reasoning. If such were the rule, we would rarely ever see a lesser offense instruction, for if the evidence showed that only the lesser offense was committed, an instruction on the greater offense would be improper. Rarely could a case ever go to a jury on more than one theory. Suffice it to say that Oklahoma's subscription to the "any-evidence test," see Morgan, 536 P.2d at 956, belies such an interpretation of Oklahoma law. Moreover, even if that interpretation of Oklahoma law were correct, such would clearly raise due process concerns under the United States Constitution.
 
 
 [1]
 Section I of the majority opinion entitled "Lesser Included Offense" deals with this issue and we adhere to our original disposition of this issue
 
 
 [2]
 For such a conclusion see Briley v. Bass, 742 F.2d 155, 164 n. 9 (4th Cir.), cert. denied, 469 U.S. 893, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984)
 
 
 [3]
 A blank slip with the defendant's license number written at an angle was introduced into evidence. Rec.vol. V, ct. ex. 17. The slip is entitled "Transmittal of Travel Card Invoices." It is not a credit card charge slip, rather, it is a three-part form whereby a dealer assigns credit card invoices to the oil company for payment. From the columns of figures appearing haphazardly on the front and back of the form, it is apparent that the form was used as a scratch pad, primarily for addition and subtraction of various amounts
 
 
 [4]
 The transcripts of the tapes are not completely accurate, as became evident in the trial, rec. vol. VI, tr. vol. III at 492-96. The jury was instructed that the words on the tape prevail. Rec. vol. VI, tr. vol. II at 344-45. Although the words on the tape are not identical to the transcribed version used in the state district court, we do not perceive any material variance. For the sake of accuracy, statements from the tape have been included
 
 
 [5]
 At trial, the defendant claimed that he talked to James Clegg by telephone in order to obtain various Oklahoma telephone numbers from him. Rec. vol. VI, tr. vol. III at 475. The defendant said that at the time of the taped conversations he "was fully aware that James was the informant on the case." Id. at 476. Defendant testified that the reason for inventing the story on the tape was to shift police attention concerning the homicide away from his family and friends and onto himself. Id. at 477-78